# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

**14-31426**

_____

## UNITED STATES OF AMERICA,

Plaintiff-Appellee

**v.**

## THOMAS WILLIAM MALONE, JR.,

Defendant-Appellant

-----------------------------------------------------------------------

- *CONSOLIDATED WITH -*

-----------------------------------------------------------------------

_____

**15-30011**

_____

## UNITED STATES OF AMERICA,

Plaintiff-Appellee

**v.**

## DREW T. GREEN,

Defendant-Appellant

Appeal from the United States District Court for the
Western District of Louisiana
CRIMINAL NUMBER 6:12-CR-146-2 and 3

_____

## BRIEF ON BEHALF OF APPELLEE,
## THE UNITED STATES OF AMERICA

_____

STEPHANIE A. FINLEY
United States Attorney
Western District of Louisiana

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501, (337) 262-6618
Attorneys for Plaintiff-Appellee

## STATEMENT REGARDING ORAL ARGUMENT

These consolidated appeals address the same two issues:  the calculation of drug quantity, and the substantive reasonableness of the defendants' below-guideline sentences.   Both issues are governed by a limited portion of an otherwise extensive record and deferential standards of review.   Further, both issues are adequately addressed in the parties' briefs, which are voluminous mostly because the guideline calculation issue turns on a detailed review of technical expert testimony.   The United States respectfully submits that oral argument would not assist the Court in this matter.

# TABLE OF CONTENTS

**PAGES**

STATEMENT REGARDING ORAL ARGUMENT ......................................i

TABLE OF AUTHORITIES ........................................................iv

STATEMENT OF JURISDICTION...........................................1

ISSUES ON APPEAL ...............................................................2

STATEMENT OF THE CASE ...................................................4

    *Overview* ........................................................................4

    *AM-2201 and NutraGenomics* .........................................5

    *"Mr. Miyagi" and Curious Goods* ....................................6

    *Drug Quantity Accountability* ........................................7

    *Indictment, Guilty Plea, and Sentencing* .........................8

SUMMARY OF THE ARGUMENT ..........................................15

ARGUMENT ........................................................................19

    I.    The district court did not clearly err in its determination that, for purposes of calculating each defendant's base offense level for an offense involving AM-2201, a controlled substance analogue not referenced in the U.S.S.G. § 2D1.1 drug tables, "the most closely related controlled substance" referenced in the tables was synthetic THC, which conclusion in turn dictated application of a ratio of 1:167 grams of AM-2201 to grams of marijuana, as that is the equivalency

**TABLE OF CONTENTS** *(continued)*

**PAGES**

expressly provided in § 2D1.1 for THC to marijuana.
The district court did not misunderstand its authority
to vary from that range under *Kimbrough v. United
States* but instead simply exercised its discretion not to
do so ........................................................................................ 19

A.   Standard of Review ........................................................ 19

B.   Applicable Substantive Law ........................................... 21

  1.   *Calculation and Consideration of the
       Advisory Range* ..................................................... 21

  2.   *Determining Drug Quantity in Cases Involving
       Analogues* .............................................................. 24

C.   Application of the Law to the Record Evidence............... 26

  1.   *The Evidentiary Hearing* ...................................... 26

  2.   *The District Court's Ruling* .................................. 36

  3.   *The Two Equivalency Determinations* .................. 38

  4.   *Kimbrough-related Determinations* ...................... 48

II.   The 117-month below-guideline sentences imposed on the
      defendants, which represent 30% downward departures from
      the high end of the advisory range, are substantively
      reasonable ................................................................................ 58

**TABLE OF CONTENTS** *(continued)*

**PAGES**

A.    Standard of Review ........................................................ 58

B.    Applicable Substantive Law ........................................... 63

    *1.    Substantive Reasonableness* ................................. 63

    *2.    Departures for Substantial Assistance* .................. 63

C.    Application of the Law to the Record Evidence............... 64

    *1.    Alleged Desselle Error* ........................................... 65

    *2.    Extent of the 5K1.1 Departure*................................. 70

CONCLUSION ........................................................................ 72

CERTIFICATE OF SERVICE and
COMPLIANCE WITH ECF FILING STANDARDS ........................... 73

CERTIFICATE OF COMPLIANCE ........................................................ 74

# TABLE OF AUTHORITIES

**PAGES**

## FEDERAL CASES

*Bursztajn v. United States,*
  367 F.3d 485 (5th Cir. 2004) ........................................................ 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ................................................................ 46-47

*Gall v. United States,*
  552 U.S. 38 (2007) ........................................................................ 21

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ................................................................ 43-44

*Kimbrough v. United States,*
  552 U.S. 85 (2007) ............................................................... *passim*

*In re MBS Management Services., Inc.,*
  690 F.3d 352 (5th Cir. 2012) ........................................................ 46

*Metropolitan Stevedore Co. v. Rambo,*
  521 U.S. 121 (1997) ....................................................................... 43

*Puckett v. United States,*
  556 U.S. 129 (2009) ...................................................................... 59

*United States v. Aguilar-Huerta,*
  576 F.3d 365 (7th Cir. 2009) ................................................... 23-24

*United States v. Alaniz,*
  726 F.3d 586 (5th Cir. 2013) ........................................................ 19

v

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Alaniz-Alaniz,*
  38 F.3d 788 (5th Cir. 1994) .......................................................... 41

*United States v. Allen,*
  587 F.3d 246 (5th Cir. 2009) ....................................................... 48

*United States v. Barnes,*
  486 Fed. App'x 579 (6th Cir. 2012) .............................................. 55

*United States v. Booker,*
  543 U.S. 220 (2005) ............................................................. 4, 58, 63

*United States v. Brooks,*
  681 F.3d 678 (5th Cir. 2012) ....................................................... 19

*United States v. Burns,*
  526 F.3d 852 (5th Cir. 2008) ................................................... 53-55

*United States v. Castleman, ___U.S.___,*
  134 S. Ct. 1405 (2014) ................................................................ 45

*United States v. Chowdhury,*
  639 F.3d 583 (2d Cir. 2011) ......................................................... 28

*United States v. Collins,*
  774 F.3d 256 (5th Cir. 2014) ....................................................... 47

*United States v. Davis,*
  316 Fed. App'x 328 (5th Cir. 2009) .............................................. 57

*United States v. Davis,*
  679 F.3d 190 (4th Cir. 2012) ................................................... 67, 69

vi

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Desselle,*
    450 F.3d 179 (5th Cir. 2006) .................................................. *passim*

*United States v. Diehl,*
    775 F.3d 714 (5th Cir. 2015) ........................................................ 58

*United States v. Dimas-Flores,*
    458 Fed. App'x 366 (5th Cir. 2012) ............................................... 62

*United States v. Duarte,*
    569 F.3d 528 (5th Cir. 2009) ........................................................ 53

*United States v. Escalante-Reyes,*
    689 F.3d 415 (5th Cir. 2012) ........................................................ 70

*United States v. Fenderson,*
    354 Fed. App'x. 236 (6th Cir. 2009) ............................................. 51

*United States v. Fernandez,*
    770 F.3d 340 (5th Cir. 2014) ........................................................ 45

*United States v. Ferron,*
    357 F.3d 722 (7th Cir. 2004) ........................................................ 47

*United States v. Figueroa,*
    647 F.3d 466 (2d Cir. 2011) .......................................................... 40

*United States v. Gibbs,*
    421 F.3d 352 (5th Cir. 2005) ........................................................ 41

*United States v. Gomez-Alvarez,*
    781 F.3d 787 (5th Cir. 2015) ........................................................ 47

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Grant,*
   493 F.3d 464 (5th Cir. 2007) ......................................................... 67

*United States v. Grant,*
   636 F.3d 803 (6th Cir. 2011) ....................................................68-69

*United States v. Gushlak,*
   728 F.3d 184 (2d Cir. 2013),
   *cert. denied*, 134 S.Ct. 1528 (2014)................................................ 46

*United States v. Hagman,*
   740 F.3d 1044 (5th Cir. 2014) ....................................................41-43

*United States v. Hashimoto,*
   193 F.3d 840 (5th Cir. 1999) ......................................................... 70

*United States v. Hazlewood,*
   526 F.3d 862 (5th Cir. 2008) ......................................................... 58

*United States v. Henderson,*
   649 F.3d 955 (9th Cir. 2011) ......................................................... 53

*United States v. Hernandez,*
   457 F.3d 416 (5th Cir. 2006) ......................................................... 58

*United States v. Hernandez-Martinez,*
   485 F.3d 270 (5th Cir. 2007) ......................................................... 21

*United States v. Howard,*
   766 F.3d 414 (5th Cir. 2014),
   *cert. denied*, 135 S. Ct. 1015 (2015)..........................................45-46

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. John,*
　　597 F.3d 263 (5th Cir. 2010) ......................................................... 56

*United States v. Johnson,*
　　33 F.3d 8 (5th Cir. 1994) ......................................................... 64, 71

*United States v. Juarez,*
　　626 F.3d 246 (5th Cir. 2010) ......................................................... 20

*United States v. Juarez-Duarte,*
　　513 F.3d 204 (5th Cir. 2008) ......................................................... 20

*United States v. Kort,*
　　440 Fed. App'x 678 (10th Cir. 2011) ............................................. 51

*United States v. Lopez,*
　　26 F.3d 512 (5th Cir. 1994) ........................................................... 67

*United States v. Manella,*
　　86 F.3d 201 (11th Cir. 1996) ......................................................... 67

*United States v. Mares,*
　　402 F.3d 511 (5th Cir. 2005) .............................................. 22, 56-57

*United States v. Mondragon-Santiago,*
　　564 F.3d 357 (5th Cir. 2009) .......................................... 22-23, 52-53

*United States v. Newsom,*
　　508 F.3d 731 (5th Cir. 2007) ......................................................... 58

*United States v. Perez,*
　　217 F.3d 323 (5th Cir. 2000) ......................................................... 44

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Quinn,*
577 Fed. App'x 336 (5th Cir. 2014) ..........................................61-22

*United States v. Rivera-Santana,*
668 F.3d 95 (4th Cir. 2012) ...........................................23

*United States v. Rodriguez,*
602 F.3d 346 (5th Cir. 2010) .........................................59

*United States v. Rublee,*
655 F.3d 835 (8th Cir. 2011) .........................................67

*United States v. Seay,*
553 F.3d 732 (4th Cir. 2009) .........................................47

*United States v. Smith,*
530 Fed. App'x 353 (5th Cir. 2013) ................................71

*United States v. Talamantes,*
620 F.3d 901 (8th Cir. 2009) .........................................23

*United States v. Troyer,*
677 F.3d 356 (8th Cir. 2012) .........................................68

*United States v. Vargas-Ocampo,*
747 F.3d 299 (5th Cir.),
*cert. denied*, 135 S.Ct. 170 (2014) ...........................43-44

*United States v. Warren,*
720 F.3d 321 (5th Cir. 2013) .........................................59

*United States v. Westbrook,*
470 Fed. App'x 332 (5th Cir. 2012) ................................58

x

# TABLE OF AUTHORITIES *(continued)*

PAGES

*United States v. Wilson,*
    322 F.3d 353 (5th Cir. 2003) ........................................................ 44

*United States v. Wooley,*
    740 F.3d 359 (5th Cir. 2014) ....................................................20-21


## FEDERAL STATUTES

18 U.S.C. § 3553(a) ........................................................... *passim*

18 U.S.C. § 3553(a)(1)................................................................ 63

18 U.S.C. § 3553(e) ............................................................ 64, 67

18 U.S.C. § 3582(c) ................................................................ 57

18 U.S.C. § 3742(a) ................................................................. 1

21 U.S.C. § 841(b)(1)................................................................ 24

28 U.S.C. § 1291 ................................................................... 1


## U. S. SENTENCING GUIDELINES

U.S.S.G. § 2D1.1........................................................... *passim*

U.S.S.G. § 2D1.1, Background .............................................. 50

U.S.S.G. § 2D1.1, Application Note 6 ................................ 25, 36, 42, 45

**TABLE OF AUTHORITIES** *(continued)*

**PAGES**

U.S.S.G. § 2D1.1, Application Note 8(A) .................................................. 24

U.S.S.G. § 2D1.1, Application Note 8(D) ................................................. 27

U.S.S.G. § 2D1.1(c) ....................................................................... 24, 27

U.S.S.G. § 2D1.1(c)(1) ....................................................................... 9

U.S.S.G. § 3E1.1(a) ........................................................................... 9

U.S.S.G. § 3E1.1(b) ........................................................................... 9

U.S.S.G. § 5C1.4 .............................................................................. 9

U.S.S.G. § 5K1.1 ...................................................................... *passim*

U.S.S.G. § 5K1.1(a)(1)-(5) ................................................................ 63

## FEDERAL RULES OF CRIMINAL PROCEDURE

Fed. R. Crim. P. 35(b) ...................................................................... 67

## STATEMENT OF JURISDICTION

The United States Court of Appeals for the Fifth Circuit exercises jurisdiction over these appeals pursuant to 18 U.S.C. §3742(a) and 28 U.S.C. §1291.

# ISSUES ON APPEAL

I.  In calculating a defendant's base offense level for an offense involving AM-2201, a controlled substance analogue not listed in the U.S.S.G. §2D1.1 drug tables, the guidelines instruct the court to find "the most closely related controlled substance" listed in the tables, and then use the equivalency ratios for that substance in determining drug quantity.  Did the district court clearly err in determining that the most closely related substance to AM-2201 was synthetic THC, which conclusion in turn dictated application of a ratio of 1:167 (AM-2201 to marijuana), the equivalency provided in §2D1.1 for THC to marijuana? Assuming the court did not err in that regard, did it appreciate its authority, pursuant to *Kimbrough v. United States*, 552 U.S. 85 (2007), to vary on policy grounds from the advisory range suggested by §2D1.1?

II.  In departing from the guideline range under U.S.S.G. §5K.1, the district court is afforded great discretion but may not consider non-assistance related grounds in increasing the departure.  Did the defendants invite any potential legal error by urging the court to consider non-assistance related grounds at sentencing, thus significantly limiting review of that claim?  If not, did the district court

abuse its discretion when it considered relevant, non-assistance related factors in tempering the extent of the departure?  Did the district court abuse its discretion when it departed downwardly only 30% as a reward for the defendant's assistance?

## STATEMENT OF THE CASE[1]

### *Overview*

Though the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), has changed many things about federal sentencing, some things remain the same:  the district court must calculate the guidelines in the same way as before, the court serves as the near-absolute arbiter of credibility determinations underlying factual disputes, and it—rather than either party—ultimately assesses the value of a defendant's cooperation.  Though both defendants attempt to cast their complaints as black-letter legal error, often in reliance on case law that has minimal relevance in the realm of fact-finding at sentencing, those claims instead concern credibility determinations and discretionary judgments that are entitled to substantial deference on appeal.

---

[1]This statement of facts derives from the PSRs, the factual basis offered in support of the defendants' guilty pleas, and evidence introduced at a joint evidentiary hearing.  Throughout this brief, as to identical documents appearing in both defendants' records on appeal, (e.g., transcripts of joint sentencing hearings), citation will be to the document as it appears in the Malone record only.  As Green has adopted significant portions of Malone's brief, references to the defendants' arguments will typically be to Malone's brief only.

### *AM-2201 and NutraGenomics*

During the relevant time period, JWH-018, a synthetic cannabinoid created in connection with research into pain and inflammatory response, was a listed as a controlled dangerous substance. AM-2201, a synthetic cannabinoid created for similar purposes, was a "controlled substance analogue" of JWH-018, as its chemical structure was substantially similar, and as it had a substantially similar pharmacological effect on the body when ingested. (ROA.14-31426.2362, 2552, 2554).

Green and Malone were the owners of NutraGenomics Mtg., LLC, a company that sold synthetic cannabinoids to customers across the country. Those substances were infused into vegetable-type material to create products that resembled marijuana; purchasers ingested them like marijuana in order to get "high." (ROA. 14-31426.2552, 2606-07).

Though the company originally sold JWH-018, sometime after March of 2011, in anticipation of new laws banning that substance, it began selling other synthetic cannabinoids such as AM-2201 instead. NutraGenomics obtained some of the AM-2201 it sold from distributors in China and some from Alexander Reece, a co-defendant, through his

companies, Mountain Industries, LLC and Blue Sky International Broker, LLC.  Although NutroGenomics was based in Georgia, it stored most of its synthetic cannabinoids in California in an effort to evade stricter Georgia laws addressing synthetic cannabinoids.  (ROA.14-31426.2552-53, 2607).

### "Mr. Miyagi" and Curious Goods

In addition to selling bulk quantities of synthetic cannabinoids like AM-2201 to customers, the defendants developed their own synthetic cannabinoid-infused product, which they named "Mr. Miyagi."[2]  That substance, visually resembling marijuana, was sold in 1-gram, 3-gram, and 10-gram quantities.  The packaging was intentionally misleading.  For example, the labelling falsely suggested that the product was intended as an air freshener and that it "compl[ied] with all U.S. federal laws."  In truth, NutraGenomics produced the product with the intent that purchasers would ingest it to

---

[2]These products were generally referred to throughout the proceedings as "Mr. Miyagi."  In fact, there were three different products produced under that brand name:  Warpaint, Timeout, and Zero.  These products ranged from 3% to 7% AM-2201, though most featured the 5% concentration.  (ROA.14-31426.2304-05, 2506).  For simplicity, these products will generally be referred to in this brief as "Mr. Miyagi" or "the Mr. Miyagi products."

get high from the synthetic cannabinoids in it.  (ROA.14-31426.2554, 2607).

Green and Malone brought in Boyd Anthony Barrow and Joshua Espinoza, both charged as co-defendants, to manufacture and sell the Mr. Miyagi products; they conducted this activity through a business called "Pinnacle Products."  Between March 2011 and December 2011, Espinoza personally manufactured the Mr. Miyagi by mixing one kilogram of AM-2201 with twenty kilograms of a leafy vegetable material called "Damiana," thus utilizing a 1:20 production ratio. (ROA.14-31426.2554-55, 2302, 2443, 2607).

One of the major purchasers of the Mr. Miyagi products was Richard Buswell, another co-defendant, who was the owner of a store called "Curious Goods" located in Lafayette, Louisiana. Buswell purchased $1.5 million in Mr. Miyagi products during the course of the conspiracy.  (ROA.14-31426.2555, 2443, 2606-07).

### *Drug Quantity Accountability*

During the relevant period, NutroGenomics sold not less than 1,400 kilograms of synthetic cannabinoids including AM-2201 to customers in 25 states, including some in the Western District of

Louisiana.   Those customers paid NutraGenomics not less than $10 million for those synthetic cannabinoids.   (ROA.14-31426.2552, 2606).

### *Indictment, Guilty Plea, and Sentencing*

On September 4, 2012, Malone, Green, and eight other defendants were charged in a Superseding Indictment with, among other charges, conspiracy to distribute and possess with intent to distribute various controlled substances, including AM-2201, a controlled substance analogue of the Schedule I controlled substance JWH-018 (Count 1). (ROA.14-31426.34-39).   A few weeks later, both Malone and Green pleaded guilty to that charge.   (ROA.14-31426.71-2, 81-82, 107; 15-30011.71-72, 80-81).

The revised PSRs set forth identical calculations regarding both defendants' offense levels.   Utilizing the 2014 version of the guidelines, the PSR converted the 1,400 kilograms of AM-2201 for which Malone and Green were held accountable to 233,800 kilograms of marijuana.[3]

---

[3]In the addenda to both defendants' PSRs, the probation officer explained in greater detail his drug quantity calculations.   He noted that because AM-2201 was not referenced in §2D1.1, the defendants' base offense levels must be determined using the marijuana equivalency of "the most closely related controlled substance" referenced in the guidelines.   Citing the criteria listed in the commentary to §2D1.1, he suggested that the most closely related substance to AM-2201 referenced in the guidelines was Tetrahydrocannabinol, Synthetic ("THC").   Converting the 1,400 kilograms of AM-2201 for which Malone and Green were held accountable to 1,400 kilograms of THC, and then in turn converting that quantity of THC to its

That quantity correlated to a base offense level of 38, pursuant to U.S.S.G. §2D1.1(c)(1). From that value, two levels were subtracted under the "safety valve," U.S.S.G. §5C1.4, and three levels were subtracted under §§3E1.1(a) and (b) for their timely acceptance of responsibility, producing a total offense level of 33 as to each defendant. (ROA.14-31426.2608-09; 15-30011.2738-39). Neither Malone nor Green received any criminal history points, resulting in a Criminal History Category I and an advisory range of 135-168 months. (ROA.14-31426.2610-11, 2619; 15-30011.2740-41, 2748).

The United States did not object to the PSR. The defendants each filed one identical objection challenging the use of the 1:167 ratio of THC to marijuana, asserting instead that the court should utilize a 1:1 ratio. (ROA.14-31426.2623; 15-30011.2752).

On September 30, 2014, the United States filed a "Motion for Departure Pursuant to Section 5K1.1" as to each defendant, asserting that he had provided "substantial assistance" to the United States. (ROA.14-31426.1074-76; 15-30011.2797-99).

---

marijuana equivalent (using the guidelines-supplied ratio of 1:167), produced 233,800 kilograms of marijuana. (ROA.14-31426.2624-25; 15-30011.2753-54).

On November 12, 2014, Malone filed a lengthy memorandum addressing various sentencing issues. In it, he asserted, among other arguments, that: (1) scientific evidence refuted the PSR's suggestion that the substance listed in the guidelines that is most similar to AM-2201 is THC; (2) even if the evidence of similarity was "in equipoise," the rule of lenity required the court to find that AM-2201 was instead most similar to marijuana; and (3) under *Kimbrough v. United States*, 552 U.S. 85 (2007), the district court had the authority to reject the ratios set forth in the guidelines and vary downwardly. (ROA.14-31426.1078-107).

On November 14, 2014, Malone filed a "Motion for Downward Variance," pursuant to 18 U.S.C. §3553(a). He argued that various factors justified "a substantial downward variance in his case" including: (1) his assistance to prosecutors, which warranted a variance irrespective of a government §5K1.1 motion; (2) his "extraordinary acceptance of responsibility," as evidenced by his voluntary withdrawal from the synthetic cannabinoids business;[4] and (3) the other reasons set

---

[4]To that motion, Malone attached an unsworn letter detailing his involvement in and eventual departure from NutraGenomics. As defense counsel later explained, that was after the Curious Goods stores in Lafayette were raided in

forth in his pre-sentencing memorandum. Malone specifically asserted that the court could consider "the totality of the §3553(a) factors" in achieving an appropriate sentence. (ROA.14-31426.2875-76).

On November 21, 2014, the United States filed as to both defendants a response to Malone's pre-sentencing memorandum. The United States asserted, among other arguments, that: (1) the PSR had properly determined that synthetic THC was the most closely related substance to AM-2201; (2) all other courts to address the controversy had determined the most closely related substance is THC, not marijuana[5]; (3) because the guideline was clear, the rule of lenity did not apply; and (4) the 1:167 ratio was proper in light of the dangers presented by AM-2201, and thus a downward deviation under *Kimbrough* was unwarranted. (ROA.14-31426.1527-49). On December 2, 2014, Malone filed a reply to the United States' memorandum, stressing once again the district court's authority to deviate based on a policy disagreement with the guidelines. (ROA.14-31426.1629-38).

---

December of 2011 but before NutraGenomics was raided in Georgia. (ROA.14-31426.2491-92, 2879-81).

[5]The United States distinguished various cases cited in Malone's pre-sentencing memorandum in which the government had stipulated to the use of a 1:1 ratio on the ground that the court had never been called upon to resolve a controverted issue in those cases. (ROA.14-31426.1536).

On December 8, 2014, Malone filed a "§5K1.1 Cooperation Filing," to which he attached various documents detailing the nature and extent of his cooperation with the United States.  (ROA.14-31426.2901-27).

On December 9, 2014, the United States filed, as to each defendant, a memorandum in support of its earlier-filed §5K1.1 motions setting forth details regarding the assistance provided by the defendants.  The United States offered three "sliding scale" recommendations for departure, ranging from 50% to 5%, tied to the court's determination of drug quantity.  A calculation consistent with the ratio suggested in the PSRs (1:167) warranted, in the United States' view, a departure of 50%, while a calculation consistent with the defendants' suggested ratio (1:1) warranted a reduction of only 5%.  (ROA.14-31426.2593-96).

The next day, in direct response to these filings, Malone filed a response to the government's §5K1.1 memorandum, asserting that in light of *United States v. Desselle*, 450 F.3d 179, 182 (5th Cir.2006), the government's recommendations were improperly tied to his offense level, and the court must instead consider only his assistance in departing under §5K1.1.  (ROA.14-31426.2958-60).

12

On December 11, 2014, Green filed a response to the United States' §5K1.1 memorandum, arguing that in light of his exceptional cooperation, he was entitled to a greater departure than recommended by the United States.  (ROA.15-30011.2710-12).

On December 15 and 16, 2014, the district court conducted an extensive sentencing hearing regarding common issues raised by Malone, Green, and some co-defendants.[6]  At that hearing, the court received, among other evidence, expert testimony from two pharmacologists on the issue of which substance listed in the guidelines was most closely related to AM-2201, and on the question of whether the 1:167 ratio was scientifically supported.  (ROA.14-31426.1670-71).

On the second day of the hearing, the court overruled the objection to the PSR as to the drug calculation, finding that THC was the most closely related substance, that that conclusion dictated a 1:167 ratio of THC to marijuana as set forth in the guidelines, and that departure from the advisory range was unwarranted under *Kimbrough*.  (ROA.14-31026.2517-25).

---

[6]Those co-defendants have separately appealed, and some of those appeals have been consolidated for purposes of briefing.

13

Later, during separate, sealed hearings as to each defendant regarding the nature and extent of his cooperation, the court expressly rejected the government's rationale behind its "sliding scale" recommendations, noting it would assume the recommendation was for a 50% departure.    After receiving information detailing each defendant's assistance, the court granted the §5K1.1 motions, indicating it would refrain from making a final decision on the extent of the departure until the final sentencing hearing.[7]   (ROA.14-31426.2533, 2542; 15-30011.2676, 2678-79).

Thereafter, at a joint sentencing hearing addressing both defendants, the court sentenced each to 117 months imprisonment, a 30% reduction from the high end of the advisory range of 135-168 months.   (ROA.14-31426.1672-78, 2492-3; 15-30011.1292-98).   Malone noted a general objection to the sentence's procedural and substantive reasonableness, incorporating by reference the points he had raised in his pre-sentencing filings regarding the equivalency ratios.   Malone did not contemporaneously object on the ground that the court had relied on non-assistance related factors in imposing sentence, nor did he object on

---

[7]At Malone's hearing, he elicited testimony from a case agent regarding his cooperation.  (ROA.14-31426.2533-40).  Green presented no evidence at his hearing.

14

the ground that the court had misunderstood its authority to deviate under *Kimbrough*. Green similarly noted a general objection to the sentence imposed but also did not assert that the district court had relied upon improper grounds in departing under §5K1.1, or that the court had misunderstood its *Kimbrough* discretion. (ROA.14-31426.2485, 2495).

Judgment as to both defendants was entered on December 29, 2014. On that same day, Malone filed a timely notice of appeal; on January 6, 2015, Green filed a timely notice of appeal. (ROA.14-31426.1679; 15-30011.1299).

## SUMMARY OF THE ARGUMENT

The district court did not clearly err when it determined that the "most closely related" controlled substance to AM-2201 was synthetic THC. After a lengthy hearing, the district court ultimately credited the testimony of the government's expert, Dr. Jordan Trecki, who drew upon four categories of reliable data: binding assays, functional assays, drug discrimination tests using rats, and clinical observations of individuals who had used AM-2201. That evidence confirmed that THC and AM-2201 both bind to the $CB_1$ receptor; both activate the $CB_1$

receptor in a way that would produce a euphoric high; rats could not discriminate between the two substances in controlled laboratory tests; less AM-2201 is required to achieve the same effect as THC; and based on clinical observations, the effects AM-2201 users experienced were more similar to THC than to marijuana. The court similarly acted within its discretion in rejecting the defense expert's suggestion that organic marijuana, a leafy green substance, was closer to AM-2201 than synthetic THC. As the court found, that suggestion is "illogical," as AM-2201 is a chemical component of the leafy green substance sold as Mr. Miyagi, while marijuana is a leafy green substance that contains numerous chemicals, only one of which is THC.

Though Malone and Green criticize the district court's endorsement of Dr. Trecki's testimony, what the district court did in this case—chose between conflicting views offered by opposing witnesses—is what district courts (and juries) do every day in resolving fact-bound questions. And this Court has repeatedly recognized that deference is owed to those determinations.

The district court did not procedurally err in its appreciation of its authority to depart on policy grounds under *Kimbrough v. United*

*States,* 552 U.S. 85 (2007). First, the court's characterization of the ratios in the Drug Equivalency Table as a congressional judgment aimed at "outlin[ing] the relative harm of certain drugs" is generally consistent with the background commentary to §2D1.1. Further, the court received extensive briefing on *Kimbrough,* heard evidence in support of the request for a *Kimbrough* departure, and engaged counsel in a discussion regarding whether a departure was warranted. The court's discussion of the holding of *Kimbrough* does not reflect any misunderstanding that it was somehow limited to crack cases. Instead, that discussion was merely intended to illustrate why, in its opinion, the 1:167 ratio of THC to marijuana suggested by the guidelines should not be disregarded. That determination was within the district court's discretion, as a district court is never required to deviate on policy grounds, nor is the court required to disagree with the advice of the guidelines, even if the particular guidelines at issue are not empirically-based.

There is no merit to the defendants' contention that the court abused its discretion when, in purported violation of this Court's ruling in *United States v. Desselle,* 450 F.3d 179, 182 (5th Cir.2006), it

17

considered non-assistance related factors in determining the extent of its §5K1.1 departures. First, both defendants invited this error by repeatedly urging the court to deviate on non-assistance related grounds. But even if they did not, a more nuanced reading of *Desselle* confirms that its restriction operates as a one-way ratchet: while the district court may not consider non-assistance related factors in granting a *greater* departure than justified by the defendant's cooperation, it may consider such factors in *limiting* the extent of a §5K1.1 departure. The rulings of various other circuits recognize as much. Absent legal error, the district court's assessment of Malone's and Green's cooperation, fully informed by a thorough consideration of information provided by both parties, is entitled to almost absolute deference on appeal.

# ARGUMENT

**I.   The district court did not clearly err in its determination that, for purposes of calculating each defendant's base offense level for an offense involving AM-2201, a controlled substance analogue not referenced in the U.S.S.G. §2D1.1 drug tables, "the most closely related controlled substance" referenced in the tables was synthetic THC, which conclusion in turn dictated application of a ratio of 1:167 grams of AM-2201 to grams of marijuana, as that is the equivalency expressly provided in §2D1.1 for THC to marijuana.  The district court did not misunderstand its authority to vary from that range under *Kimbrough v. United States* but instead simply exercised its discretion not to do so.**

## A.   Standard of Review

The court of appeals reviews preserved objections to the district court's legal interpretation of the Sentencing Guidelines *de novo* and its factual findings for clear error.   *United States v. Brooks*, 681 F.3d 678, 712 (5th Cir.2012).  The determination of drug quantity at sentencing is a factual finding that will be upheld unless it is implausible in light of the record as a whole. *United States v. Alaniz*, 726 F.3d 586, 618 (5th Cir.2013).   In resolving factual disputes at sentencing, the court of appeals "give[s] deference to the credibility determinations of the

district court." *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir.2008).

However, if the defendant raises an objection for the first time on appeal, or raises an objection that is different from the one he raised in the district court, review is for plain error only. *United States v. Juarez*, 626 F.3d 246, 253-54 (5th Cir.2010). Plain error is "clear" or "obvious" error that affects substantial rights. *Id*. at 254. Even if all three plain error criteria are satisfied, the court of appeals will only exercise its discretion to correct forfeited error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Ibid*.

Malone and Green preserved objections to the district court's calculation of drug quantity, thus they are entitled to full review of that issue on appeal. However, while they urged the district court to deviate from the advisory range under *Kimbrough*, they never specifically objected on the ground that the district court misunderstood the nature and extent of its discretion in that regard. Had they done so, the district court could have clarified its position, thus potentially avoiding the very ambiguity about which they complain on appeal. *See United States v. Wooley*, 740 F.3d 359, 367 (5th Cir.2014) ("To preserve error,

an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction."); *United States v. Hernandez-Martinez*, 485 F.3d 270, 272 (5th Cir.2007) (noting the contemporaneous objection requirement is designed to prevent "sandbagging" by allowing the district court to correct errors before cases end up on appeal, and thus electing to review for plain error only because "[h]ad the defense objected at sentencing, the court easily could have clarified or, if necessary, corrected itself" regarding its consideration of a particular fact at sentencing).

## B.    Applicable Substantive Law

### 1.    *Calculation and Consideration of the Advisory Range*

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which will then serve as "the starting point and the initial benchmark" when imposing sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). This is necessary because even though the guidelines are no longer binding on district courts, "a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines, which are designed to guide the judge toward a fair

sentence while avoiding serious sentence disparity." *United States v. Mares,* 402 F.3d 511, 518-19 (5th Cir.2005).

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court considered whether the district court abused its discretion when, in a case involving crack cocaine, it elected to deviate from the advisory range in part on a disagreement with the guidelines' disparate treatment of crack and powder cocaine offenses, "even in a mine-run case." The Court ruled that it did not, as the guidelines addressing those substances "do not exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109.

Since *Kimbrough*, this circuit has recognized that while "district courts certainly may disagree with the Guidelines for policy reasons and may adjust a sentence accordingly[,] . . . if they do not, we will not second-guess their decisions under a more lenient standard simply because the particular Guideline is not empirically-based." *United States v. Mondragon-Santiago*, 564 F.3d 357, 367 (5th Cir.2009). This is because "the work of the Sentencing Commission is ongoing, and the sentencing process will continue to evolve as sentencing courts and the

Commission refine the factors that determine a sentence's reasonableness." *Ibid.*

Thus, in this circuit, though the district court has the discretion under *Kimbrough* to vary from the guidelines based on policy considerations, it is not compelled to do so. Various other circuits recognize this principle as well. *See e.g., United States v. Rivera-Santana*, 668 F.3d 95, 101 (4th Cir.2012) (noting that "[a]lthough a sentencing court may be entitled to consider policy decisions underlying the Guidelines, including the presence or absence of empirical data, it is under no obligation to do so"); *United States v. Talamantes*, 620 F.3d 901, (8th Cir.2009) (the district court's discretion to vary based on policy disagreements "does not mean that a district court must disagree with any sentencing guideline, whether it reflects a policy judgment of Congress or the Commission's 'characteristic' empirical approach"); *United States v. Aguilar-Huerta*, 576 F.3d 365, 368 (7th Cir.2009) (noting that a district judge "should not have to delve into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline[,] . . . [f]or if he is required to do that, sentencing hearings will become unmanageable, as the focus

shifts from the defendant's conduct to the 'legislative' history of the guidelines").

## 2. *Determining Drug Quantity in Cases Involving Analogues*

Offense levels for controlled substances are generally supplied by U.S.S.G. §2D1.1, which "use[s] the sentences provided in, and equivalences derived from, [21 U.S.C. §841(b)(1)] as the primary basis for the guideline sentences." U.S.S.G. §2D1.1, Application Note 8(A). However, because §841(b)(1) addresses only the more common controlled substances, the guidelines provide special rules for cases involving controlled substances not specifically referenced in the Drug Quantity Table, §2D1.1(c). For those substances, the court must determine the base offense level by (1) using the Drug Equivalency Tables in the commentary to convert the quantity of the controlled substance involved in the offense to its equivalent quantity of marijuana, (2) finding the equivalent quantity of marijuana in the Drug Equivalency Table, and (3) using the offense level that corresponds to the equivalent quantity of marijuana as the base offense level for the controlled substance involved in the offense. U.S.S.G. §2D1.1, Application Note 8(A).

Yet another rule applies if, as in this case, the controlled substance appears in neither the Drug Quantity Table nor the Drug Equivalency Table.    Neither AM-2201 nor JWH-018, the controlled substance for which AM-2201 is an analogue, is specifically referenced anywhere in §2D1.1.  In such instances, the guidelines require that the sentencing court "determine the base offense level using the marijuana equivalency of the most closely related controlled substance referenced in this guideline." U.S.S.G. §2D1.1, Application Note 6.  In determining the most closely related controlled substance, the court shall consider:

> (A) Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

> (B) Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

> (C) Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

*Ibid.*

## C.    Application of the Law to the Record Evidence

Malone and Green both argue that the district court clearly erred when it applied a 1:167 ratio of AM-2201 to marijuana in calculating their advisory ranges.  They assert that equivalency is unsupported by reliable scientific evidence, especially studies on humans.  Alternatively, they contend the court misunderstood its post-*Kimbrough* discretion to reject the ratio suggested by the guidelines and instead select a different ratio, such as 1:1 or 1:7.  (Malone's brief, pp. 38-59).  The record fully supports the district court's drug quantity findings, which turn almost exclusively on credibility determinations.  Further, the record confirms the court was well aware of its *Kimbrough* discretion but permissibly exercised its discretion not to deviate on policy grounds.

### 1.    *The Evidentiary Hearing*

At a joint evidentiary hearing conducted as to Malone, Green, and six of their co-defendants, the district court addressed a common guideline calculation question:  which controlled substance referenced in §2D1.1 was "most closely related" to AM-2201.   As neither AM-2201

26

nor JWH-018 was listed on either the Drug Quantity Table (§2D1.1(c)) or the Drug Equivalency Table (§2D1.1, Application Note 8(D)), that determination was necessary to determine the equivalent quantity of marijuana, and ultimately, the operative base offense level.

To that end, the court heard the testimony of two experts in pharmacology—Dr. Jordan Trecki, called by the United States, and Dr. Nicholas Cozzi, called by the defense.  Dr. Trecki offered detailed reasons in support of his conclusion that the referenced controlled substance that was most closely related to AM-2201 was synthetic THC, a laboratory-manufactured equivalent of the cannabinoid found in organic (i.e., cultivated) marijuana.[8]  As Dr. Trecki explained, that conclusion was informed by a consideration of two of the three criteria provided in the §2D1.1 commentary:  whether THC has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to AM-2201, and whether a lesser or greater

---

[8]Synthetic TCH is the active ingredient in a drug called Marinol, a Schedule III controlled substance prescribed to lessen the side effects of chemotherapy. Because Marinol contains a low dose of THC and is taken orally, most of the adverse effects of THC are avoided.  (ROA. 14-31426.2252-55, 2261, 2295-96).

quantity of AM-2201 is needed to produce a substantially similar effect on the central nervous system as THC.[9]  (ROA.14-31426.2202-04).

First, regarding whether AM-2201 and THC produce substantially similar stimulant, depressant, or hallucinogenic effects, Dr. Trecki noted that two *in vitro* studies, a "binding assay" and a "functional assay," confirm that the two substances function in nearly identical fashion.  Binding assays, which determine if a substance binds to a particular receptor, reveal that both THC and AM-2201 bind to the cannabinoid-1 receptor ("$CB_1$ receptor") and the cannabinoid-2 receptor ("$CB_2$ receptor"). The functional assays show that THC is an agonist of that receptor, meaning it activates it and produces the desired effect. AM-2201 is also an agonist at the $CB_1$ receptor.  However, because THC is a partial agonist while AM-2201 is a full agonist, AM-2201 activates the receptor to an even greater degree than TCH.  Activation of the $CB_1$ receptor produces euphoria; activation of the $CB_2$ receptor produces

---

[9]Dr. Trecki conceded that the other criterion suggested in the commentary, structural similarity, was irrelevant, as no substances referenced in §2D1.1 were chemically similar to AM-2201.  (ROA.14-31426.2204).  A substance need not satisfy all three considerations. *See United States v. Chowdhury*, 639 F.3d 583, 586 (2d Cir. 2011) (noting the §2D1.1 commentary "explicitly requires that the sentencing judge consider the enumerated factors, 'to the extent practicable,' thus recognizing that, in some circumstances, sentencing courts will be unable to match substances under each of the factors").

anti-nausea effects, resistance to pain, and immunosuppression. (ROA. 14-31426.2207, 2247-50, 2295).

Dr. Trecki also discussed an *in vivo* study performed on rats by Gatch and Forester at the University of Texas pursuant to a contract awarded by the National Institute on Drug Abuse.[10]  That study was designed to determine if animals could discriminate between AM-2201 and THC.  The study concluded that the rats could not differentiate between the two substances, suggesting the two substances produced similar pharmacological effects in the rats.[11]  (ROA.14-31426.1420-27, 2208-10).

---

[10]That study was commissioned by the DEA due to a lack of scientific literature documenting animal studies involving AM-2201.  The preliminary data were released so the study could be peer-reviewed prior to publication.  (ROA.14-31426.2207-09, 2281-82, 2294).

[11]Dr. Trecki explained in detail how these animal discrimination studies are conducted.  During the training phase, a rat is trained to distinguish between how an injection of THC makes him feel as opposed to an injection of saline, which is the control solution.  The animal designates which substance he has received by pressing a designated lever in his cage.  If he correctly chooses the lever corresponding to the injection he has received, he is rewarded with a food pellet.  Once the animal correctly identifies the type of injection he has received 85% of the time, the testing phase begins, during which the THC is replaced with AM-2201, and no food rewards are provided.  If the animal presses the THC lever when he has received AM-2201, this suggests the animal cannot distinguish between the THC and the AM-2201, because they make him feel the same way.  (ROA.14-31426.2209, 2283-88, 2292-93).

Dr. Trecki also noted certain findings of the Gatch and Forester study regarding what he called "potency." That aspect of their study confirmed that the "ED50 value," that is, the dose required in order to achieve a certain result in 50% of the test animals, was lower for AM-2201 than for THC. According to Dr. Trecki, this indicated that AM-2201 was more "potent" than THC. (ROA.14-31426.2217-19).

Finally, Dr. Trecki discussed case studies involving individuals who had ingested AM-2201 that compared the adverse effects reported by those subjects to the known adverse effects from THC. He noted that AM-2201's adverse effects included convulsions, twitches, hallucinations, and in one instance, a suicide. The adverse effects of THC included hallucinations, paranoia, psychotic activity, and reddened eyes. Dr. Trecki opined that the effects of AM-2201 were more similar to THC than they were to marijuana, which produced effects including an unsteady gait, dizziness, euphoria, reddened eyes, and the inability to speak. (ROA.14-31426.2219-20).

Dr. Trecki also discussed the results of a "tetrad" of animal studies involving, among other substances, JWH-018, the substance for which

AM-2201 is an analogue.[12] He explained that the tests in the tetrad examined locomotor activity, body temperature changes, pain response, and catalepsy (the tendency of an animal to return to a resting state). In each of these respects, the rats exhibited similar responses to the JWH-018 as they did to THC. Dr. Trecki further noted that one-tenth the dosage of JWH-018 was required to provoke the same cataleptic response in the rat as THC, and that researchers noted that the rats experienced twitches and convulsions even at the lower dosage of JWH-018. (ROA.14-31426.2210-2216).

Toward the end of his testimony, Dr. Trecki addressed various assertions included in declarations submitted by the defense's expert, Dr. Cozzi, prior to the hearing. With regard to Dr. Cozzi's criticism that AM-2201 had not yet been tested on human subjects, Dr. Trecki asserted that there was no practical way to do so, as the Food and Drug Administration has not yet identified any medical or therapeutic benefit from AM-2201, and as its reported adverse effects were too severe to

---

[12]Dr. Trecki testified that to his knowledge, no tetrad studies addressing AM-2201 had yet been conducted. He noted, however, that the Gatch and Forester study did include one test from the tetrad: the locomotor test. Specifically, the researchers noticed that rats injected with AM-2201 experienced a decrease in their locomotion similar to that experienced when they were injected with THC. Further, it took less AM-2201 to achieve that same result. (ROA.14-31426.2217).

secure the necessary approvals.  Dr. Trecki further repudiated a metabolic study cited by Dr. Cozzi, often referred to during the hearing as "the Hutter study," in which five milligrams of AM-2201 was administered orally, not to test its pharmacological effects, but to determine how it was metabolized in the stomach, small intestine, and liver.  As oral ingestion subjects a substance to "first-pass metabolism," meaning metabolism by the liver before the substance reaches the brain, Dr. Trecki suggested that type of study would offer little insight into the pharmacological effects of a drug that is typically smoked, a means of ingestion that generally evades first-pass metabolism.  In contrast, injection, the method used in the Gatch and Forester study, bypasses first-pass metabolism, just like smoking. Finally, the scope of the Hutter study was extremely limited:  only a single subject—one of the study's authors—ingested the AM-2201 orally, and he did so only once.  (ROA.14-31426.2221-23, 2243-45, 2392).

Dr. Trecki refuted other aspects of Dr. Cozzi's declaration, such as his assertion that certain drugs that produce THC-like responses in animals in drug discrimination tests can produce non-THC-like responses in humans, including drugs like MDMA, diazepam, and

pentobarbital.  Dr. Trecki noted that while those drugs might have substituted for THC in the drug discrimination tests, they do not satisfy the binding and functional assay tests, and all available data should be considered *in toto* instead of focusing on each criterion in isolation.[13] (ROA. 14-31426.2224-26).

Dr. Trecki also refuted Dr. Cozzi's suggestion that the dosages of AM-2201 administered in the animal studies were much higher than the dosages ingested by a typical human user.  First, Dr. Trecki noted that Dr. Cozzi's dosage calculations were irreconcilable with widely-accepted dosage guidance from the Center for Drug Evaluation and Research ("CDER").[14]  But further, Dr. Trecki observed that using the CDER conversion formula to convert the effective rat dosage identified in the Gatch and Forrester study to an equivalent human dosage, that dosage would fall within the reported psychoactive human

---

[13]For example, neither MDMA, diazepam, nor phenobarbital bind with specific affinity to the $CB_1$ receptor like THC, AM-2201, and JWH-018 do, nor are they specific agonists at the $CB_1$ receptor.  (ROA.14-31426.2224-2226).

[14]The CDER tables suggest appropriate initial dosages for different types of test animals in controlled studies.  Those guidelines also suggest equivalent dosages for humans that account for the fact that humans are generally more sensitive to drugs than other animals.  (ROA.14-31426.2227-28, 2232).  During cross examination, Dr. Cozzi admitted he had not used the CDER tables but had instead done a "back of the envelope" calculation regarding human dosages.  (ROA.14-31426.2383-84).

dosage range that Dr. Cozzi himself had referenced in his second declaration.[15]   (ROA.14-31426.2227-28, 2230-34).

Finally, on redirect examination, Dr. Trecki rejected any assertion that organic (i.e., cultivated) marijuana, rather than synthetic THC, should be considered most similar to AM-2201.  He noted that organic marijuana includes 300 or more chemicals and between 60 and 80 different cannabinoids, only one of which is THC.  At least one of those cannabinoids, cannabidiol, can "mediate," or lessen, the effects of the THC, thus reducing the euphoric high.  In contrast, THC, like AM-2201, is a single chemical.[16]   (ROA.14-31426.2205, 2272-80).

Dr. Cozzi spent most of his testimony attempting to refute Dr. Trecki's assertion that THC was the controlled substance that was most

---

[15]In that second declaration, Dr. Cozzi had recognized that reports available on the website of the European Monitoring Centre for Drugs and Drug Addiction suggest that psychoactive human doses of AM-2201 are reportedly in the 0.25-2 mg range.  (ROA.14-31426.1657).   According to Dr. Trecki, the Gatch and Forrester study had concluded that an effective dosage of AM-2201 in rats was .11 mg, which, using the CDER tables, converts to a human dose of 1.06 mg.  That dosage falls within the psychoactive range as identified by Dr. Cozzi.  (ROA.14-31426.2233).

[16]Malone repeatedly notes in his brief that synthetic THC is the same chemical as the THC found in cultivated marijuana, an assertion that in part forms the foundation for his argument that marijuana is most similar to AM-2201. (Malone's brief, pp.28, 57).  While that is true, it overlooks the fact that THC is one of many cannabinoids and one of hundreds of other chemicals found in cultivated marijuana, while synthetic THC is a pure form of THC.

closely related to AM-2201.  He did so by noting the absence of human studies on AM-2201; deprecating the value of animal studies in light of physiological and metabolic differences between humans and lower animals, and the possibility of false positives in animal testing; criticizing the dosages in the Gatch and Forester study as being too high[17]; attempting to distinguish between the "potency" and "efficacy" of a drug; and asserting that responsible human studies on AM-2201 were possible in spite of the risks.   (ROA.14-31426.2332-47, 2357, 2368, 2371).  Regarding the 1:167 ratio between THC and marijuana included in the §2D1.1 Drug Equivalency Table, Dr. Cozzi stated, consistent with Dr. Trecki's earlier concession, that that ratio was not supported by any scientific literature.  (ROA.14-31426.2236, 2347).

At bottom, Dr. Cozzi maintained that animal studies, though potentially predictive or suggestive of how certain substances will react in humans, could not support a definitive determination on the relevant

---

[17]On cross examination, Dr. Cozzi conceded that Drs. Gatch and Forester were good scientists who used good methodologies.  He further conceded that in his first of two declarations submitted prior to the hearing, he principally attacked their study on the ground that it had not yet been peer reviewed.  It was only after their study had passed the peer review process and been published that he raised certain other objections to their findings in his second declaration, namely his criticism about the dosages.  (ROA.14-31426.2378-82).

inquiry in this case. Thus, because of the lack of human studies on AM-2201, he stated he could offer no opinion on whether AM-2201 produces a similar effect as THC. (ROA.14-31426.2333, 2341-42, 2356-57, 2368).

When the district court noted that it "[didn't] get to say 'I don't know,'" and that it "[had] to pick something in the schedule," and when it then pressed Dr. Cozzi to choose an alternate controlled substance, Dr. Cozzi characterized the court's query as "kind of a nonscience question." He ultimately chose cultivated marijuana, noting that the plant material infused with the AM-2201 (Damiana) was analogous to marijuana, and it was consumed in the same way and for the same intended effect as marijuana.[18] (ROA.14-31426.2357-58).

## 2.    *The District Court's Ruling*

Considering this expert testimony and applying the considerations listed in §2D1.1, Application Note 6, the district court ultimately found that the United States had proved by a preponderance of the evidence that THC was the substance referenced in the guidelines that was most

---

[18]Dr. Cozzi testified on direct examination that the plant material used to make the Mr. Miyagi products, Damiana, had "a number of psychoactive effects in its own right," a claim Malone repeats in his brief. (ROA.14-31426.2359-60; Malone's brief at p. 29). On cross examination, however, Dr. Cozzi admitted he was unaware of a 2013 study concluding that Damiana had no psychoactive effects. (ROA.14-31426.2361).

closely related to AM-2201. The court credited the testimony of Dr. Trecki, specifically noting: (1) the fact that both AM-2201 and THC are agonists that bind to the $CB_1$ receptor producing a euphoric high; (2) the results of the drug discrimination study using rats; (3) the reported experiences of individuals who had used AM-2201; and (4) the results of tetrad studies done on JWH-018, the substance for which AM-2201 is an analogue. Though the court acknowledged Dr. Cozzi's criticism regarding the lack of human studies on AM-2201, it noted that it ultimately had to make a choice among the substances listed in §2D1.1, and that even Dr. Cozzi had acknowledged that animal studies were always the first step in testing drugs. (ROA.14-31426.2617-23).

Going further, the court dismissed Dr. Cozzi's suggestion that organic marijuana was more closely related to AM-2201 than THC, noting that it is the THC in marijuana that produces a euphoric high, just as it is the AM-2201 in Mr. Miyagi that produced the same effect. The court also noted that it was "illogical" to compare a chemical like AM-2201 to a leafy green substance like marijuana, particularly since marijuana contains over 300 other chemicals, some of which mediate the effects of the THC. (ROA.14-31426.2522).

Having concluded that THC was the most closely related substance to AM-2201, the court noted that the guidelines provided a marijuana equivalency ratio of 1:167 (THC to marijuana). Though it acknowledged the lack of scientific findings supporting that ratio, as well as the defendants' arguments urging the court to abandon it on *Kimbrough*-type grounds, the court expressly declined to do so. It observed that the guidelines were the expression of Congress, and that the ratios "seek to outline the relative harm" of controlled substances "by converting everything to marijuana." The court distinguished *Kimbrough*, noting that ruling concerned the unfairness of a comparison between two drugs, not a challenge to an equivalency ratio that it had earlier characterized as means of converting drug quantities to a common "coin of the realm." (ROA.14-31426.2350, 2523-25).

### 3.     *The Two Equivalency Determinations*

The district court's finding that synthetic THC was the most closely related substance to AM-2201 is well supported by the record as a whole and thus cannot be clearly erroneous. As noted, the district court received extensive pre-hearing briefing on that issue, and then listened during a lengthy hearing to the testimony of two expert

witnesses in pharmacology. The court ultimately credited the testimony of the government's expert, Dr. Trecki, who drew upon four categories of data: binding assays, functional assays, drug discrimination tests using rats, and clinical observations of individuals who had used AM-2201. That evidence confirmed that THC and AM-2201 both bind to the $CB_1$ receptor; both activate the $CB_1$ receptor in a way that would produce a euphoric high; rats could not discriminate between the two substances in controlled laboratory tests; less AM-2201 is required to achieve the same effect as THC; and based on clinical observations, the effects AM-2201 users experienced were more similar to THC than to marijuana.[19]  (ROA.14-31426.2207, 2216-20, 2247-50, 2295).

In addition to reasonably crediting this testimony, the court similarly acted within its discretion in rejecting Dr. Cozzi's self-characterized "nonscience" suggestion that organic marijuana, a leafy green substance, was closer to AM-2201 than synthetic THC because

---

[19]In both the district court and in his brief, Malone makes much of Dr. Cozzi's distinction between drug "potency" and "efficacy."  (ROA.14-31426.2336-37; Malone's brief, pp. 45-46 ).  However, the commentary to §2D1.1 uses neither term, focusing simply on whether a "lesser or greater quantity" of the unreferenced substance is needed to achieve a substantially similar effect.  Dr. Trecki testified that Gatch and Forrester's study confirmed that less AM-2201 than THC was required to observe the same effect in rats.  (ROA.14-31426.2217-19).

both marijuana and AM-2201-infused products were smoked to achieve the same type of high. As the court found, that suggestion is "illogical," as AM-2201 is a chemical occurring in the leafy green substance sold as Mr. Miyagi, while marijuana is a leafy green substance that contains numerous chemicals, only one of which is THC. (ROA.14-31426.2520-23). At least one circuit court has found that the mere fact that two substances were "interchangeable on the street" was insufficient to support a finding of relatedness under §2D1.1. *See United States v. Figueroa*, 647 F.3d 466, 469-470 (2d Cir.2011) (remanding for an evidentiary hearing so the court could consider other similarities or differences).

Malone and Green criticize the district court's endorsement of Dr. Trecki's testimony, relying principally on their own expert, Dr. Cozzi, who vigorously challenged aspects of the Gatch and Forrester study, the general validity of animal studies as a predictor of drug effects on humans, and Dr. Trecki's "totality-of-the-data" approach to answering the ultimate equivalency question. (Malone's brief, pp. 40-52). But what the district court did in this case—chose between conflicting views offered by opposing witnesses—is what district courts (and juries) do

every day in resolving fact-bound questions. And this Court has repeatedly recognized that deference is owed to those determinations. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir.2005) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses."); *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir.2004) (same, specifically with respect to expert testimony); *United States v. Alaniz-Alaniz*, 38 F.3d 788, 791 (5th Cir.1994) (noting that the appellate court "may find testimony to be 'incredible as a matter of law' if the witness testifies to facts that he physically could not have observed or events that could not have occurred under the laws of nature," but "[s]hort of that, we exercise great deference to a district court's credibility findings").

Malone and Green attempt to undercut this principle by conflating two other principles—the so-called "equipoise rule" and the "rule of lenity"—neither of which has any application here. In this regard, their heavy reliance on *United States v. Hagman*, 740 F.3d 1044 (5th Cir.2014), is misplaced. Though Malone specifically quotes from

41

*Hagman* in connection with his discussion of Application Note 6 to §2D1.1, (Malone's brief, p. 42), *Hagman*, a firearm case, did not address that provision at all. Hagman pleaded guilty to illegally possessing a pistol he had admittedly taken from the gunsmith shop where he worked. The factual dispute at sentencing concerned whether Hagman should also be held responsible for eleven other firearms stolen from the shop during a burglary that had occurred around the same time. At sentencing, the government offered no evidence regarding Hagman's participation in the burglary, relying exclusively on its assertion that it was "just entirely too coincidental" that eleven firearms had disappeared from the shop at the same time Hagman had admittedly taken the pistol. The district court, accepting that inference as sufficient proof, held Hagman responsible for all twelve firearms in the calculation of his advisory range. *Id.* at 1047.

This Court reversed. It noted that there was *no* evidence, either direct or circumstantial, that Hagman had ever possessed the firearms, and while Hagman's taking of the pistol around the same time as the burglary was a "questionable coincidence," the "improbability of such a coincidence is not, in and of itself, proof by a preponderance of

42

evidence." *Id.* at 1052.   As the United States had offered *nothing* as proof of a disputed sentencing fact, *Hagman*, at most, stands for the unremarkable proposition that the United States fails to carry its burden of proof when it offers *no evidence at all*.   The Court's later observation in *Hagman* that factual disputes should be resolved in the defendant's favor "[i]f the evidence appears to be equally balanced" is arguably dictum, as there was absolutely no evidence to "balance" in *Hagman*.[20]

But even if that observation is not dictum, it is questionable whether an "equipoise rule" survives this Court's post-*Hagman* en banc ruling in *United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir.), *cert. denied*, 135 S.Ct. 170 (2014).   In that case, this Court repudiated the equipoise rule, albeit in the context of sufficiency-of-the-evidence review of a criminal conviction under the *Jackson v. Virginia* standard.[21]   And

---

[20]Further, *Hagman* cites as authority for that rule *United States v. Wilson*, 322 F.3d 353, 361 (5th Cir.2003), which in turn cites *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9 (1997).   *Metropolitan Stevedore Co.*, a civil case, addressed burden and quantum of proof at the trial level, not standard of review on appeal.

[21]Under that standard, a reviewing court must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). This is the same standard of review that both Malone and Green assert in their

while the instant case instead concerns clear error review of factual findings in connection with sentencing, the same fundamental concern—deference to the credibility choices of the fact-finder—undergirds both types of review. *Compare Vargas-Ocampo*, 747 F.3d at 301 (noting that "*Jackson's* 'deferential standard' of review, however, does not permit the type of fine-grained factual parsing necessary to determine that the evidence presented to the factfinder was in 'equipoise'") *with United States v. Perez*, 217 F.3d 323, 332 (5th Cir.2000) (noting the district court's "superior position in making such credibility calls," and thus deferring to sentencing determinations that were based largely on the district court's assessment of witnesses' credibility).

Similarly, the "rule of lenity" has no application here.   (Malone's brief at pp. 52-53).  "The rule of lenity only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must

---

briefs is applicable to the court's determination of equivalency under §2D1.1. (Malone's brief, p. 37; Green's brief, p. 3).   The rule abandoned in *Vargas-Ocampo* had provided that "the court must reverse a conviction if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *Vargas-Ocampo*, 747 F.3d at 302.

simply guess as to what Congress intended." *United States v. Castleman*, ___U.S.___, 134 S.Ct. 1405, 1416 (2014). Application Note 6 to §2D1.1 contains no such ambiguities. The plain text uses words and phrases that have commonly understood meanings including "chemical structure," "stimulant, depressant, or hallucinogenic effect," and "substantially similar." *See e.g., United States v. Fernandez*, 770 F.3d 340, 344 n.8 (5th Cir.2014) (rejecting the defendant's assertion that the court should apply the rule of lenity with regard to a guideline provision that used the word "ransom" but did not define it; if the statutory language is not unusual, technical, or otherwise unclear, a term is not ambiguous merely because neither the guideline nor a published circuit opinion define it).

Further, to the extent the defendants suggest the guideline is ambiguous because, as in this case, it can provoke a complex inquiry, this Court has already rejected the assertion that a statute is ambiguous merely because its application is legally challenging. *United States v. Howard*, 766 F.3d 414, 426 n.11 (5th Cir.2014), *cert. denied*, 135 S. Ct. 1015 (2015) (refusing to apply the rule of lenity in spite of the

"difficulty" in applying a certain Model Penal Code definition to determine if the defendant's conduct violated a statute).

Malone and Green attempt to evade the rule that deference is owed to the credibility choices of the fact-finder by asserting that the government's evidence is so flawed that it was simply unworthy of belief. They do so primarily by relying on a collection of rulings, mostly arising in civil cases and all involving application of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), or one of its predecessors, that suggest animal studies are categorically unreliable. (Malone's brief, pp. 46-47, 49-50). But as various circuit courts have recognized, the *Daubert* standard, which derives from the Federal Rules of Evidence, does not burden the district court's consideration of evidence at sentencing.[22] *See e.g., United States v. Gushlak*, 728 F.3d 184, 197 n.10 (2d Cir.2013), *cert. denied*, 134 S.Ct. 1528 (2014) (because the Rules of Evidence do not apply at sentencing, expert testimony on a particular sentencing issue was "therefore not governed by the

---

[22]The defendants never urged the district court to subject the evidence offered by the government at sentencing to *Daubert* scrutiny. Such an exercise would have been pointless, as it would have required the district court to act as its own gatekeeper. *See In re MBS Management Services., Inc.,* 690 F.3d 352, 357-58 (5th Cir.2012) (*Daubert* safeguards are not as essential if the district court is the trier of fact).

strictures of [Federal Rule of Evidence] 702, nor, it follows, by authorities interpreting that Rule, for example, [*Daubert*]"; *United States v. Seay*, 553 F.3d 732, 741-42 (4th Cir.2009) (same); *United States v. Ferron*, 357 F.3d 722, 724 (7th Cir.2004) (same, reversing the district court); *see generally*, *United States v. Collins*, 774 F.3d 256, 265 (5th Cir.2014) ("[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial," quoting U.S.S.G. §6A1.3).

And while it is true that sentencing information must possess "sufficient indicia of reliability to support its probable accuracy," *United States v. Gomez-Alvarez*, 781 F.3d 787, 796 (5th Cir.2015), the evidence in this case satisfies that standard. In spite of the defendants' criticisms, even Dr. Cozzi conceded that animal studies are "suggestive" and "predictive" of human responses, and that Gatch and Forrester were good scientists who used good methodologies. (ROA.14-31426.2333, 2341, 2368, 2378). Further, the district court was free to credit Dr. Trecki's testimony refuting Dr. Cozzi's criticism of Gatch and Forrester's dosages, and it was also free to find that reports of the

effects experienced by actual human users of AM-2201, though limited and anecdotal, sufficiently corroborated the conclusions drawn from the binding assay, the functional assay, and the animal discrimination studies.[23] (ROA.14-31426.2257-58, 2219-20, 2231-33).

At bottom, the district court permissibly elected to base its conclusion that AM-2201 was most similar to THC on evidence that it deemed credible, and that bore sufficient "indicia of reliability." That credibility-dependent finding is entitled to substantial deference on appeal.

### 4. *Kimbrough-related Determinations*

Malone and Green further argue, for the first time on appeal, that the district court misunderstood its authority to deviate from the advisory range based on a disagreement with the guidelines' treatment of AM-2201 in their cases. As noted above, the district court's discretion to deviate in light of *Kimbrough* was extensively briefed prior to

---

[23]At the evidentiary hearing, the court admitted a June 2014 "Critical Review Report" produced by the World Health Organization that summarized current data regarding AM-2201. In a section addressing adverse reactions in humans, the report summarized the effects of the drug in fatal and non-fatal cases in which AM-2201 use was analytically verified. (ROA.14-31426.1852-56). While it is true, as Malone asserts in his brief, that some patients referenced in the article had ingested another cannabinoid in addition to AM-2201, the district court was still entitled to assign significant weight to this evidence. *United States v. Allen*, 587 F.3d 246, 257 (5th Cir.2009) ("the weight of the evidence [is] the exclusive province of the fact-finder").

sentencing by both Malone and the United States. In his pre-sentencing memorandum, Malone discussed in detail the Supreme Court's holdings in *Kimbrough*, his assertion that the Sentencing Commission had "abdicated its institutional role" when it created the 1:167 ratio between THC and marijuana, and his contention that the 1:167 ratio did not reflect the current potency of cultivated marijuana. (ROA.14-31426.1099-107). In its response, the United States asserted a *Kimbrough*-type deviation was *unwarranted* in light of the dangerousness of AM-2201; it never asserted that one was *unavailable* as a matter of law. (ROA.14-31426.1541-45).

In addressing all defendants' request for a policy-based variance, the court acknowledged that both Dr. Trecki and Dr. Cozzi had admitted that the 1:167 ratio between THC and marijuana lacked a scientific foundation. The court further noted that while the defendants had "relied on the *Kimbrough* case in urging the Court to throw out this guideline," it would not do so. Principally, the court believed the ratio reflected a congressional judgment ultimately aimed at "outlin[ing] the relative harm of certain drugs." It distinguished the THC/marijuana ratio from the crack/powder ratio at issue in *Kimbrough*, noting that

*Kimbrough* was concerned with "comparing one ratio for one drug to another ratio for another drug and pointing out the unfairness of those two ratios." Noting that the defendants instead wanted the court to "throw out the ratio of 1:167 based on its arbitrary nature," the court stated that it "would decline to do so." (ROA.14-31426.2524-25).

The district court did not procedurally err in its appreciation of its authority to depart. First, the court's characterization of the nature of the Drug Equivalency Table ratios was correct. Its statement that the ratios represent a congressional judgment aimed at "outlin[ing] the relative harm of certain drugs" is consistent with the background commentary to §2D1.1, which notes that while the base offense levels in §2D1.1 are generally determined by the Anti-Drug Abuse Act of 1986, "further refinement of drug amounts is essential to provide a logical sentencing structure for drug offenses." The commentary further explains that "[t]o determine these finer distinctions, the Commission consulted numerous practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Forces." U.S.S.G. §2D1.1, Background. At least two circuit courts have relied on

this commentary in dismissing arguments that the ratios in §2D1.1 are arbitrary. *See United States v. Kort*, 440 Fed. App'x 678, 684 (10th Cir.2011) (in rejecting the assertion that the guidelines' equivalency ratio for ice to marijuana versus its more lenient ratio of methamphetamine to marijuana was arbitrary, approvingly citing the background commentary to §2D1.1; "[g]iven the Sentencing Commission based the drug quantities and conversion rates provided in §2D1.1 on Congressional directives and appropriate reliance on experts and practitioners in the field, [Kort] has not shown they are arbitrary or that the district court erred or otherwise abused its discretion in utilizing them"); *United States v. Fenderson*, 354 Fed. App'x. 236, 241 (6th Cir.2009) (approvingly citing the background commentary to §2D1.1 in rejecting the defendant's claim that a crack-to-powder conversion factor in §2D1.1 had no scientific basis and was instead an "arbitrary multiplier").

Second, the record does not support the defendants' assertion that the district court believed *Kimbrough* applied only in the context of crack cocaine cases. (Malone's brief, pp. 56-59). Although it is true the district court distinguished *Kimbrough*, it did so only to illustrate the

differences between the crack/powder ratio at issue in *Kimbrough* and the THC/marijuana equivalency ratio at issue in this case. As the court had noted at an earlier juncture in the sentencing hearing, "§2D1.1 converts everything to marijuana," because that is "the coin of the realm." While the court regarded the concern in *Kimbrough* as "between one conversion to marijuana and another conversion to marijuana," that is, "one equivalency to another equivalency," the 1:167 ratio was part of a congressional effort to assess the dangerousness of various drugs with respect to a common denominator—marijuana. (ROA.14-31426.2350-51). The court's discussion of *Kimbrough* does not reflect any misunderstanding that its holding was somehow limited to crack cases. Instead, that discussion merely explains why, in the court's opinion, the 1:167 ratio should not be disregarded.

This determination was within the district court's discretion, as a district court is never required to deviate on policy grounds, nor is the court required to disagree with the advice of the guidelines, even if the particular guidelines at issue are not empirically based. *See e.g., Mondragon-Santiago*, 564 F.3d at 367 (noting that if district courts elect not to deviate on policy grounds, "we will not second-guess their

decisions under a more lenient standard simply because the particular Guideline is not empirically-based"); *United States v. Henderson*, 649 F.3d 955, 964 (9th Cir.2011) ("district courts are not obligated to vary from the child pornography Guidelines on policy grounds if they do not have, in fact, a policy disagreement with them"); *see also, United States v. Duarte*, 569 F.3d 528, 529-30 (5th Cir.2009) (holding that *Kimbrough* does not force courts "into a piece-by-piece analysis of the empirical grounding behind each part of the sentencing guidelines" but instead "affirm[s] the traditional entrustment of sentencing to the discretion of district courts, close to the ground and more cognizant of the details of offender and offense that should be determinative of sentence").

*United States v. Burns*, 526 F.3d 852 (5th Cir.2008), on which the defendants rely in support of their argument that the Court misunderstood the extent of its *Kimbrough* authority, is distinguishable. In sentencing proceedings conducted before the Supreme Court issued its ruling in *Kimbrough,* Burns urged the court to depart downwardly from the advisory range to account for the disparity between the crack and powder guidelines. The court acknowledged the ongoing debate over the crack/powder disparity but

noted that "the guidelines are what the guidelines are today," and that it believed it had "no—limited discretion, if any" to depart on that basis. *Id.* at 860-61.

By the time of appeal, the *Kimbrough* ruling had issued, and this Court concluded that the district court "did not accurately predict the subsequent *Kimbrough* decision." Because this Court could not tell from the record whether the judge would have considered a policy-based departure if he had known he had the authority to do so, it remanded for re-sentencing. *Id.* at 861-62.

In Malone's and Green's cases, the record reflects the district court was fully cognizant of its authority to depart. *Kimbrough* had been decided almost seven years earlier, and it was extensively briefed by Malone in particular prior to sentencing. Well aware that the defendants were requesting a departure on *Kimbrough* grounds, the district court, over the United States' objection, permitted Malone to elicit testimony from Dr. Cozzi regarding why adjustments were ultimately made to the crack cocaine penalties, and whether the THC-to-marijuana equivalency included in the guidelines was scientifically supported. (ROA.14-31426.2349-53).

54

The district court questioned Dr. Cozzi directly during his testimony on this issue, asking, for example, whether there was a scientific basis for other equivalencies in the guidelines, such as the 1:200 ratio for cocaine to marijuana, a question the witness could not answer. (ROA.14-31426.2349). Similarly, the court engaged Malone's counsel in a dialogue about the defendants' arguments in support of a *Kimbrough* variance. (ROA.14-31426.2348-49, 2350-53).

Finally, in announcing its decision not to depart, the court referenced the *Kimbrough* decision by name, stating that while the defendants had asked the court "to throw out the ratio of 1:167 based on its arbitrary nature, . . . [the court] would decline to do so." (ROA.14-31426.2525). Thus, Malone's and Green's cases are clearly distinguishable from *Burns*. *Compare United States v. Barnes*, 486 Fed. App'x 579, 586-87 (6th Cir.2012) (in rejecting the defendant's argument that the district court misunderstood its discretion to deviate from the advisory range on *Kimbrough* grounds, noting that the court engaged in a lengthy dialogue with counsel during which it asked counsel why some other drug ratios were not capricious, and it noted that the Sentencing Commission had engaged in "a reasoned analysis of the

appropriateness of these particular sets of guidelines and drug quantities"; the district court's reluctance to accept Barnes' argument "is not tantamount to failing to consider the argument or to considering the [drug] conversion ratio sacrosanct").

The record reflects that the district court, aware of its departure authority under *Kimbrough* and in spite of defense arguments that the guidelines' ratios were not scientifically based, simply elected not to disagree with the guidelines, and thus not to deviate. This is a permissible exercise of discretion, not procedural error.

But even if the court did plainly err by misunderstanding *Kimbrough*, the defendants are not entitled to re-sentencing unless that error affected the sentence imposed. *United States v. John*, 597 F.3d 263, 284-85 (5th Cir.2010). As this court has recognized, the defendant bears the burden of demonstrating prejudice under the plain error standard, and "if the effect of the error is uncertain so that we do not know which, if either, side it helped[,] the defendant loses." *Mares*, 402 F.3d at 521.

In this case, the United States filed §5K1.1 motions as to both defendants, and though both the United States and the defendants

56

recommended substantial departures of at least 50%, the district court rejected those recommendations, electing instead to grant 30% reductions. As discussed in greater detail below, those sentences were based in part on the court's belief that their conduct was extremely reckless and motivated purely by profit. (ROA.14-31426.2485, 2492). Had the court wanted to impose lesser sentences, it could have easily done so on the basis of the §5K1.1 motions without any resort to a *Kimbrough*-type departure by attaching greater relative value to the defendants' cooperation. *See e.g., United States v. Davis*, 316 Fed. App'x 328, 331-32 (5th Cir.2009) (any error by the district court in failing to consider Davis' request that the court depart on *Kimbrough* grounds was harmless; while Davis's appeal was pending, the district court denied his motion for reduction of sentence under 18 U.S.C. §3582(c), thus making it clear that the district court, even if it considered recent changes to the guidelines resulting from the crack cocaine amendments, would not impose a lower sentence). At best, the effect of any *Kimbrough* misunderstanding is uncertain; accordingly, the defendants cannot establish their entitlement to re-sentencing. *Mares*, 402 F.3d at 521.

## II. The 117-month below-guideline sentences imposed on the defendants, which represent 30% downward departures from the high end of the advisory range, are substantively reasonable.

### A.     Standard of Review

Generally speaking, as to alleged defects noticed in the district court, the court of appeals reviews the substantive reasonableness of a sentence under an abuse of discretion standard.[24]     *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir.2015).     That process that is "highly deferential" to the district court, as "the sentencing court is in a better

---

[24]In addition to challenging whether the district court based its departures on improper considerations, Malone and Green challenge the extent of the departures. Even after *Booker*, some decisions of this Court have adhered to the rule that the court of appeals lacks jurisdiction to review the extent of a departure unless the court erred as a matter of law. *See e.g., United States v. Westbrook*, 470 Fed. App'x 332, 333 (5th Cir.2012) (noting that because district courts have almost complete discretion to determine the extent of a departure under §5K1.1, "the only ground on which the defendant can appeal the extent of a departure is that the departure was a violation of law");    *United States v. Hernandez*, 457 F.3d 416, 424 (5th Cir.2006) ("We have no jurisdiction to review Appellants' apparent claim that the court should have departed further.").    However, other decisions hold to the contrary. *See e.g., United States v. Newsom*, 508 F.3d 731, 733-34 (5th Cir.2007) ("Reasonableness review necessitates that we review a district court's decision to depart and the extent of the departure for abuse of discretion.").    The United States assumes without conceding that the extent of the departure is subject to review, mindful that jurisdiction cannot be conferred by agreement of the parties. *United States v. Hazlewood*, 526 F.3d 862, 864 (5th Cir.2008).

position to find facts and judge their import under the §3553(a) factors with respect to a particular defendant." *Ibid*.

However, if the defendant raises an objection on appeal that is different from the objections raised below, review is for plain error only. *United States v. Warren*, 720 F.3d 321, 332 (5th Cir.2013); s*ee also, Puckett v. United States*, 556 U.S. 129, 135 (2009) (iterating the components of plain error review).

Finally, a different rule applies if a party raises an objection and then abandons it, or if the party's actions invited the error. *See United States v. Rodriguez*, 602 F.3d 346, 350-51 (5th Cir.2010) (noting that waiver occurs when a party consciously chooses to forego an objection, while the invited error doctrine applies when a party induces the error). "Waived errors are unreviewable," while review of invited errors is for "manifest injustice" only. *Ibid*.

In the district court, both Malone and Green objected to the substantive reasonableness of their departure sentences. Thus, to the extent this Court has jurisdiction to review them, they are subject to review for abuse of discretion.

However, as to their claim on appeal that the district court, in violation of this Court's ruling in *United States v. Desselle*, 450 F.3d 179, 182 (5th Cir.2006), legally erred by considering non-assistance related factors in determining the extent of its departure, review is either precluded or for "manifest injustice" only.   Malone, in a pre-sentencing motion for variance filed well after the United States' had filed its §5K1.1 motion, urged the court to consider "the totality of the §3553(a) factors" in imposing sentence.  (ROA.14-31426.2875-76).  A few weeks later, after the United States' had filed a detailed memorandum in support of its §5K1.1 motion that included "sliding scale" departure recommendations tied to the court's findings on relevant conduct, Malone filed a reply.   In it, he cited *Desselle,* objected to the government's attempt to tie the extent of the departure to his offense level, and urged the court to depart under §5K1.1 only on assistance-related grounds.   (ROA.14-31426.2958-60).  Green did not raise a *Desselle*-based objection prior to sentencing.

At the beginning of Malone's and Green's sealed §5K1.1 hearings, the court noted it had rejected the government's position regarding a "sliding scale" departure recommendation.   (ROA.14-31426.2533; 15-

30011.2676).    Shortly  thereafter,  at  the  joint  sentencing  hearing,

Malone argued various non-assistance related factors in mitigation of

sentence,  including  the  short  duration  of  the  conspiracy  and  the

defendant's early withdrawal from it.    Malone's counsel asked that the

sentence imposed "be as reasonable as possible under 3553(a)," and that

it "be as reasonable under all of those circumstances as it can be."

(ROA.14-31426.2488-92).    Green, through counsel, also argued §3553(a)

considerations, noting that he had voluntarily ceased operations before

his business was raided, and that his drug addiction played a role in his

offense.    (ROA.15-30011.2479-81).    At no time after the district court

pronounced sentence did either Malone or Green object on the ground

that  the  court  had  impermissibly  considered  factors  other  than  the

nature  of  their  assistance  in  gauging  the  appropriate  extent  of  the

§5K1.1 departures.

Because both Malone and Green urged the court to depart from

the  advisory  range  on  non-assistance  related  factors  including

*Kimbrough* grounds, the facts and circumstances of the offense, and

their history and characteristics, any possible error was invited.    *See*

*e.g., United States v. Quinn*, 577 Fed. App'x 336, 337 (5th Cir.2014)

(noting that "Quinn arguably invited or waived any [*Desselle*] error by arguing for consideration of other factors such as his age, the staleness of a prior conviction, and his nonviolent history," though electing to review for plain error, the standard of review identified by the government).

Alternatively, because Malone, after raising a *Desselle* objection in response to the government's "sliding scale" recommendation, arguably abandoned it when the court ruled in his favor regarding the sliding scale, that objection should be considered waived. *See United States v. Dimas-Flores*, 458 Fed. App'x 366, 367-69 (5th Cir.2012) (discussing waiver and invited error principles where the defendant "built his affirmative sentencing argument for leniency" around application of an enhancement that he later contended on appeal was improperly applied, and ultimately finding no miscarriage of justice). At best, review of any alleged *Desselle* error should be for plain error only, as neither defendant noted a contemporaneous objection at sentencing after the court stated its reasons in support of sentencing.

## B.     Applicable Substantive Law

### 1.     *Substantive Reasonableness*

As the Supreme Court made clear in *Booker*, the substantive reasonableness of a particular sentence must be gauged with reference to the factors set forth in 18 U.S.C. §3553(a).  *United States v. Booker*, 543 U.S. 220, 261 (2005).  Among the considerations specifically listed in §3553(a) are the facts and circumstances of the offense, and the history and characteristics of the defendant.  18 U.S.C. §3553(a)(1).

### 2.     *Departures for Substantial Assistance*

Section 5K1.1 provides that a district court's reasons for departure may include the following: (1) the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and (5) the timeliness of the defendant's assistance.  U.S.S.G. §5K1.1(a)(1)-(5).  Any additional factors a court considers must be related to determining the "nature,

extent, and significance of assistance." *United States v. Desselle*, 450 F.3d 179, 182 (5th Cir.2006). "[T]he extent of a §5K1.1 or §3553(e) departure must be based solely on assistance-related concerns." *Ibid*.

"[W]hen ruling on a section 5K1.1 motion, the sentencing court must exercise its independent judgment and discretion first to determine whether departure is warranted and, finding such, the extent of that departure." *United States v. Johnson,* 33 F.3d 8, 9 (5th Cir.1994). "In doing so the court is free to deny departure or to grant a departure which is greater or smaller than that recommended by the government." *Id.* at 9-10.

## C.    Application of the Law to the Record Evidence

Malone and Green assert that the district court improperly considered, in derogation of *Desselle*, non-assistance-related grounds in departing downwardly under §5K1.1, and that the court failed to depart to a sufficient degree in light of their extraordinary cooperation. (Malone's brief, pp. 60-71; Green's brief, pp. 9-17).   Neither argument has merit.

### 1.    Alleged Desselle Error

After conducting separate, sealed hearings on the nature and extent of each defendant's cooperation, the district court announced in open court the defendants' sentences and its reasons supporting those sentences.  As to Malone, it noted that it had considered the defendant's cooperation along with the seriousness of the offense, the potential and actual harm from his actions, the recklessness of his conduct, the fact that the defendant's goal was to make a lot of money quickly, his role in the offense, and his relative culpability.  (ROA.14-31426.2492-93).   As to Green, the court separately stated that it had considered the same factors.  (ROA.14-31426.248).  The court expressly rejected the government's departure recommendation, imposing sentences that were 30% rather than 50% below the advisory range.  (ROA.14-31426.2482, 2484-85, 2492-93).

Both defendants assert that their cases are squarely governed by *Desselle*, which, they contend, precluded the district court from considering non-assistance related factors in determining the extent of their departures under §5K1.1.   But, a more nuanced reading of *Desselle* confirms that its restriction operates as a one-way ratchet:

while the district court may not consider non-assistance related factors in granting a *greater* departure than that justified by the defendant's cooperation, it may consider such factors in *limiting* the extent of a §5K1.1 departure.

In *Desselle*, the government deemed the defendant's cooperation minimal, and so it urged only a two-level reduction under §5K1.1 and §3553(e).    The district court significantly exceeded that recommendation, departing downwardly by ten levels and justifying the departure on non-assistance factors such as the defendant's age, his low risk of recidivism, and the fact that he had also been punished through the forfeiture of his assets.    The government objected and later appealed.    While this Court held that the district court had erred in relying on non-assistance related factors, that holding arose in the context of a challenge to a *greater* departure than the defendant's cooperation had merited, not a lesser one.    *Desselle*, 450 F.3d at 181-82. Quite simply, this Court was not called upon in *Desselle* to address the issue presented in this case:    whether a court can *limit* the extent of a §5K1.1 departure to account for legitimate §3553(a)-related concerns.

However, other circuit courts, when squarely presented with that issue, have recognized the distinction.[25] *See e.g., United States v. Davis*, 679 F.3d 190, 196-197 (4th Cir.2012) (affirming the district court's decision to grant a lesser reduction under Rule 35(b) than recommended by the government in light of the defendant's criminal history, the nature of the offense, and the fact that he had already received an earlier §5K1.1 reduction; "[i]mposing appropriate sentences requires that courts be able to balance all relevant sentencing factors when determining a defendant's actual sentence reduction"); *United States v. Manella*, 86 F.3d 201, 204 (11th Cir.1996) (with regard to an analogous Rule 35(b) reduction, noting that "[n]othing in the text of the rule purports to limit what factors may militate against granting a Rule 35(b) reduction," and "[s]imilarly, the rule does not limit the factors that may militate in favor of granting a smaller reduction"); *United States v. Rublee*, 655 F.3d 835, 839 (8th Cir.2011) (though a reduction in sentence based on §3553(e) may only be based on assistance-related concerns, "[the court's] decision to *limit* the §3553(e) reduction, as

---

[25]Though these cases were decided in the context of Rule 35(b) motions, they are equally applicable here. Rule 35(b) incorporates the standards set out in §5K1.1. *United States v. Grant*, 493 F.3d 464, 468 (5th Cir.2007); s*ee also, United States v. Lopez*, 26 F.3d 512, 523 (5th Cir.1994) (describing Rule 35(b) as "§5K1.1's post-sentencing analog").

opposed to extending it further downward, need not be based only on factors related to the assistance provided"); *see also, United States v. Troyer*, 677 F.3d 356, 360 (8th Cir.2012) (even assuming the district court considered various §3553(a) factors in determining the extent of a §5K1.1 departure, that error "was simply a matter of how the district court's analysis was sequenced").

The Sixth Circuit uses different terminology but ultimately achieves the same end. Like this circuit and the other circuits cited above, it does not permit a district court to increase a sentence reduction based on non-assistance related factors. However, it does permit the court to engage in a "contextual" analysis and "temper" the extent of a reduction in light of "other factors affecting the valuation." *See United States v. Grant,* 636 F.3d 803, 815-817 (6th Cir.2011). For example, *Grant* held that "a district court might recognize that a defendant's assistance is of extremely high value but also recognize that fully valuing the cooperation would give the defendant a sentence much lower than co-defendants who were far less culpable." *Id.* at 817. Or, "a district judge might properly consider a sentence below a certain point inappropriate for a defendant convicted of a heinous crime, and thus

value his cooperation less . . . ." *Ibid.* As that Court concluded, "[t]he practical implications of this decision are quite similar to those of our sister circuits." *Ibid.* (collecting cases).

The transcript of Malone's and Green's joint sentencing hearing reflects that the district court, though believing the defendants were entitled to some reduction for their cooperation, properly exercised its discretion to "temper" those reductions in light of relevant §3553(a) considerations. Those included their culpability relative to their co-defendants, the risk to others created by their conduct, and that fact that their offenses were motivated by the desire to make a lot of money quickly. (ROA.14-31426.2481, 2492). Consideration of those is fully consistent with this court's statutory command to consider the §3553(a) factors in imposing sentence. *See Davis*, 679 F.3d at 196 (noting that "allowing the district court to consider all relevant sentencing factors is consistent with the broad discretion afforded to the district court during sentencing" and the court's statutory duty to consider the §3553(a) factors). Further, a reading of *Desselle* that would restrict the district court's discretion in that way would create a perverse incentive *against*

the filing of §5K1.1 motions by the government and the granting of such motions by the district court.

Alternatively, even if the court erred, that error was not "clear" or "obvious."  As noted, *Desselle* concerned only the grounds on which a court could grant a *greater* departure than justified by the defendant's cooperation; it did not address at all the grounds on which the court could *limit* or temper a §5K1.1 departure.  Because that issue is still unsettled in this circuit, even as of the time of this filing, any error cannot be "plain."  *See United States v. Escalante-Reyes*, 689 F.3d 415, 423 (5th Cir.2012) (en banc) ("plainness" of error is determined with regard to the law at the time of appeal).

### 2.    *Extent of the 5K1.1 Departure*

Thus, assuming no legal error, the district court's assessment of Malone's and Green's cooperation is entitled to almost absolute deference on appeal.  *United States v. Hashimoto*, 193 F.3d 840, 843 (5th Cir.1999) ("District courts have almost complete discretion to determine the extent of a departure under §5K1.1.").  The record reflects that the court conducted separate, sealed hearings at which the court received information—and in Malone's case live testimony—

regarding the nature, extent, and utility of the information provided by the defendants. (ROA.14-31426.2533-42; 15-30011.2676-79). While it is true the court ultimately disagreed with the government's recommendation and awarded a 30% reduction from the high end of the range rather than a 50% reduction from the low end, it was free to do so. *Johnson*, 33 F.3d at 9-10 (noting "[t]he government's evaluation and recommendation, while deserving substantial weight, is but one factor to be considered in this equation," and "the court is free to deny departure or to grant a departure which is greater or smaller than that recommended by the government"). Though the defendants may disagree with the sentences imposed, that disagreement does not equate to an abuse of discretion. *United States v. Smith*, 530 Fed. App'x 353, 355 (5th Cir.2013) ("Smith's argument that the district court failed to give adequate weight to [a certain mitigating factor] does not show an abuse of discretion on the district court's part in balancing the 18 U.S.C. §3553(a) factors; instead, it amounts to a mere disagreement with the weight the district court gave to the various sentencing factors and thus is insufficient to warrant reversal.").

## CONCLUSION

The defendants' sentences should be affirmed in all respects.

Respectfully submitted,

STEPHANIE A. FINLEY
United States Attorney

BY: *s/ Camille A. Domingue*

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney
800 Lafayette Street Suite 2200
Lafayette, LA 70501
(337) 262-6618

## CERTIFICATE OF SERVICE and
## COMPLIANCE WITH ECF FILING STANDARDS

I hereby certify that a copy of the foregoing Brief on Behalf of Appellee, The United States of America, was filed electronically with the Fifth Circuit Court of Appeals using the electronic filing system. Notice of this filing will be sent to counsel of record either by operation of the court's electronic filing system and/or via United States Mail to:

Mr. Steven H. Sadow
260 Peachtree Street, N.W.
Suite 2502
Atlanta, GA 30303

Mr. Stuart M. Mones
146 Nassau Street, NW
Atlanta, GA 30303.

In addition, I hereby certify that: (1) all required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and, (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Lafayette, Louisiana, this the 16th day of June, 2015.

BY: *s/ Camille A. Domingue*

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney
800 Lafayette Street Suite 2200
Lafayette, LA 70501
(337) 262-6618

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32(a), the undersigned certifies:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

>    (a)    This brief contains **13,944** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

>    (a)    (a)    This brief has been prepared in a proportionally spaced typeface using:

>    Software Name and Version – **Microsoft Word 2010**;

>    in Typeface Name and Font Size - **Century Schoolbook 14 pt.**

3.    THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN FED. R. APP. P. 32(a)(7) MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.


*s/Camille A. Domingue*               June 16, 2015

CAMILLE A. DOMINGUE (#20168)          Date
Assistant United States Attorney